STATE of Delaware

v.

James E. COOKE.

Criminal Action Numbers IN–05–06–1529 thru IN–05–06–1533 and IN–05–06–2390 thru IN–05–06–2394.
ID No. 0506005981.

Superior Court of Delaware,
New Castle County.

Submitted: Aug. 10, 2006.
Decided: Nov. 1, 2006.

**598**

Steve P. Wood, Esquire, State Prosecutor, and Diane C. Walsh, Deputy Attorney General, Department of Justice, for State of Delaware.

J. Brendan O'Neill, Esquire, and Kevin J. O'Connell, Esquire, of Wilmington, Delaware, attorneys for the defendant.

### OPINION

HERLIHY, Judge.

Defendant James Cooke has been indicted for the murder of Lindsay Bonistall and for several other offenses related to that matter. In the same indictment, he has been charged with offenses, such as burglary, robbery and theft, which involve two other persons. He has moved to sever the Bonistall related counts from those involving the other persons. Though not his exclusive reason, the primary basis for his severance motion is that he intends to plea guilty, but mentally ill to the Bonistall related charges but not guilty to the other charges.

Cooke has been indicted for eleven offenses broken down this way:

1. Counts I—VI:
 a. Count I is the charge of intentional murder of Lindsay Bonistall;
 b. Count II is the charge of felony murder (rape/murder) of Lindsay Bonistall;
 c. Count III is the charge of rape first degree involving Lindsay Bonistall;
 d. Count IV is the charge of burglary first degree involving Lindsay Bonistall's apartment and the rape charge;
 e. Count V is the charge of arson first degree involving the apartment building in which Bonistall's apartment was located;
 f. Count VI is a charge of reckless endangering first degree relating to that apartment building.

2. Count VII—IX:
 a. Count VII is the charge of burglary second degree involving the residence of Amalia Caudra;
 b. Count VIII is the charge of robbery second degree and the alleged victim is Amalia Caudra;
 c. Count IX is the charge of theft (misdemeanor) involving the property of Amalia Caudra.

3. Counts X—XI:
 a. Count X is the charge of burglary second degree relating to the residence of Cheryl Harmon;
 b. Count XI is the charge of theft (misdemeanor) involving the property of Cheryl Harmon.

The offenses in Counts I—VI involving Lindsay Bonistall are alleged to have occurred on May 1, 2005. It is these charges to which Cooke indicates he plans to enter the defense of guilty, but mentally ill. The three charges relating to Amalia Caudra

are alleged to have occurred on April 30, 2005. The last two indicted charges relating to Cheryl Harmon are alleged to have occurred on April 27, 2005. The charges relating to Amalia Caudra and Cheryl Harmon are the ones Cooke says his plea will be not guilty, based on the lack of identification of the perpetrator.

### Cooke's Claims

■ Cooke argues that he will suffer unfair prejudice by the joinder of all of these charges in one trial. First, the cumulative evidence of all three sets of charges could lead the jury to convict him of all eleven counts, whereas, if tried separately that may not happen. Second, because the evidence against him in the Bonistall case is so "strong,"[1] the jury in a trial of all the charges could conclude he has a general criminal disposition and convict him of the charges involving Caudra and Harmon.

The third basis of his severance motion is a claim of unfair prejudice in that he will suffer embarrassment and confusion by the inconsistent pleas of guilty, but mentally ill and not guilty because of lack of identification to the other two sets of charges.

### State's Response

The State answers that it will present evidence that the three crimes are so inextricably intertwined that it will be impossible to prove one set of charges without proof of the others. It avers the offenses were a part of a common plan or scheme.

It asserts all evidence shows a same or similar *modus operandi*. It argues all three crimes occurred within one mile of the others, at residences of single females and entry was accomplished through doors or windows. In addition, the State observes two of the three sites had unusual writing on the walls (Bonistall and Harmon). The State conjectures Cooke did not have time to write on the walls at the April 30th home invasion (Caudra) as the intruder, purportedly Cooke, fled after the victim yelled to her roommate when he ordered her to take off her clothes.

### Applicable Standards

■ This Court has the discretion to grant or deny severance.[2] The determination of these issues is a matter of discretion.[3] While abuse of discretion generally depends on the facts and circumstances of each case, generally that discretion has been abused when there is a reasonable probability substantial injustice may result from a joint trial.[4] In exercising its discretion, the Court is to set forth a statement of record supporting that exercise of discretion.[5] The defendant has the burden of demonstrating such prejudice.[6] Mere hypothetical prejudice does not meet this burden.[7]

### Discussion

■ Both Cooke and the State agree Delaware Superior Court Criminal Procedure Rule 8 permits the joinder of offenses in an indictment if separate counts of the

---

1. Cooke motion paragraph 10.

2. *Bates v. State,* 386 A.2d 1139, 1141 (Del. 1978).

3. *Floudiotis v. State,* 726 A.2d 1196, 1214 (Del.1999).

4. *Jenkins v. State,* 230 A.2d 262, 272–73 (Del. 1967).

5. *Floudiotis,* 726 A.2d at 1214.

6. *U.S. v. Crockett,* 514 F.2d 64, 70 (5th Cir. 1975).

7. *Bates,* 386 A.2d at 1142 (Del.1978).

charged offenses are the same or similar character.[8] Rule 8 "is designed to promote judicial economy and efficiency, provided that the realization of those objectives is consistent with the rights of the accused."[9] However, Rule 8 must be read in conjunction with Superior Court Criminal Procedure Rule 14.[10] Under Rule 14, if it appears Cooke is prejudiced by joinder of the offenses, this Court may order separate trials on the various counts.[11] Thus, if Cooke's claims of prejudice are unsubstantiated, the claims are outweighed by judicial economy and efficiency objectives.[12]

First, this Court must determine whether the charged offenses are the same or of similar character. Although not a prerequisite, one pertinent factor to be considered by the Court is whether there is reciprocal admissibility of the evidence to be presented.[13] No prejudicial effect would result from the joinder of trials if the evidence pertaining to one crime would be admissible in the trial of another offense.[14] However, evidence of one crime is inadmissible if it is to prove a general disposition to commit another crime, even when the crime is of the same nature and character as the offense charged.[15]

If the Court finds the charged offenses are the same or of similar character and not used to prove a general disposition to commit another crime, this Court must then ascertain whether Cooke would be prejudiced by the joinder of the various charges in the indictment. Based on *Wiest v. State*[16] the prejudice which Cooke may suffer from joinder of the various offenses can be: 1) the jury cumulating the evidence of the various charged offenses and finding guilt when, if the offenses were considered separately, it would not so find; or 2) the jury using evidence of one crime to infer a general criminal disposition of Cooke to find guilt of the charged offenses; or 3) Cooke may be subject to embarrassment or confusion in presenting different and separate defenses to different charged offenses. The test used to determine whether Cooke has met his burden of showing prejudice is whether judicial economy concerns are outweighed by joinder so highly prejudicial the Court is com-

---

**8.** **(a) Joinder of Offenses.** Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
Superior Court Criminal Rule 8(a).

**9.** *Mayer v. State*, 320 A.2d 713, 717 (Del. 1974).

**10.** *State v. Flagg*, 739 A.2d 797, 799 (Del.Super.1999).

**11.** If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or

provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney general to deliver to the court for inspection in camera any statements or confessions made by the defendants which the state intends to introduce in evidence at the trial.
Superior Court Criminal Rule 14.

**12.** *Sexton v. State*, 397 A.2d 540, 545 (Del. 1979).

**13.** *Skinner v. State*, 575 A.2d 1108, 1118 (Del. 1990).

**14.** *Bates*, 386 A.2d at 1142.

**15.** *Getz v. State*, Del.Supr., 538 A.2d 726, 730 (1988).

**16.** 542 A.2d 1193, 1195 (Del.1988).

pelled to sever the trials.[17] If the Court holds Cooke could be prejudiced by the joinder, this Court must then decide whether it should order separate trials on the various counts or provide such other relief which justice requires.

### Same or Similar Circumstances

This consideration, always unique to each case, has intricacies which relate to the *Wiest* tests and this Court's discretion to sever or not to sever. In this consideration, the Court has the benefit of transcripts from a proof positive hearing, a suppression hearing, and a preliminary hearing. Cooke's lead counsel now was his counsel in all those proceedings.

The call about a fire at Bonistall's apartment was received at 2:49 a.m. on May 1st.[18] Later that morning, after the fire was extinguished, Bonistall's body was found in a bathtub in her apartment. She had been strangled to death. Later examination determined she (probably) had been raped. The semen recovered from her body was later compared to Cooke's. The DNA comparison by the Delaware Medical Examiner's office was "(o)ne in six hundred, seventy-six sextillion in the African–American population" (676,000,000,-000,000,000,000).[19] Fingernail scrapings recovered from the body apparently had a similar result.

On the walls inside Bonistall's apartment were written these words:

"KKK" apparently written with a blue magic marker; such a marker was recovered in the apartment.

"White power" written near "KKK."

"More bodies are going to be turnin up dead."

"We want are (sic) weed back. Give us are (sic) weed back." [20]

Cooke, after being arrested, made no statements about the murder, or, at least, any of which the Court has been made aware.

The Caudra offenses are alleged to have occurred on April 30, 2005, at a residence less than half a mile away. Caudra was awakened around 1:15 in the morning by a flashlight being shown in her face. The person holding the flashlight said "Shut the f ... up or I'll kill you." [21] She was wearing a tee shirt and underwear. The intruder asked for cash which she surrendered. He then asked her for her credit cards, and she gave him two cards. The intruder then said "Take off your clothing or I'll f..... kill you." [22] He repeated it.

Caudra screamed for her roommate who was home at the time.[23] The intruder fled, but he took with him Caudra's Jansport backpack. Inside were an iPod and Trimspa (OTC) weight loss medication in a metal container. Caudra's roommate's cell phone was also taken.

Caudra identified the intruder as an African–American male around five feet three inches (near her height), husky build, husky voice, no facial hair and wear-

17. *State v. Howard*, 1996 WL 190045 (Del.Super.), at *4 citing *Drew v. United States*, 331 F.2d 85 (C.A.D.C.1964); *United States v. Kenny*, 645 F.2d 1323 (9th Cir.1981).

18. Suppression hearing transcript, February 2, 2006, p. 12.

19. Preliminary hearing transcript, June 22, 2005, p. 11.

20. Proof positive hearing transcript, October 28, 2005, pp. 25–6.

21. *Id.* at p. 11.

22. *Id.* at p. 12.

23. Proof positive hearing transcript, pp 11–13.

ing wool clothing, including gray wool gloves. She helped the police develop a composite drawing of the intruder.

Approximately three hours later, around 4:18–19 on April 30 someone attempted to use one of Caudra's cards at a Wilmington Trust MAC machine. A picture was taken of the user and which the police used to develop a composite of the suspect.

Rochelle Cambell, Cooke's female friend and mother of several of his children, lived at 9 Lincoln Drive in Newark. He lived there from time to time. That residence is located about a quarter mile from Caudra's residence and about a quarter to half a mile from the Wilmington Trust MAC machine mentioned above.[24]

Campbell was home the evening of April 30th. At one point, after putting her young children to bed, she fell asleep while watching TV. When she woke up Cooke was there. She saw female pink panty liners on the floor and asked Cooke about them. He answered, "It's nothing."[25] But then he started going through and pulling out the contents of the backpack, which she described as a book bag.

He pulled out a silver container the contents of which were diet pills.[26] She saw that the "book bag" had an ID on it with "Amelia" maybe spelled with an "O" and a "Spanish last name." She figured it was a female name.[27] She also saw credit cards, an iPod, and a cell phone. While he was doing this, she asked Cooke where he got it, and he said he took it from two guys while they were not looking and who had been involved in an accident.[28]

Curiously what had awakened her was the screeching of tires and then seeing blue flashing lights on Park Place, across Elkton Road from her residence.[29] Caudra's residence is on West Park Place. The Court does not know if the flashing blue lights had anything to do with the Caudra incident.

There was more conversation between Campbell and Cooke, and eventually he said he was going to use the credit cards. He thought there was a PIN number on the receipts in the bag. This conversation, she said, was around 1:00 a.m.[30] Campbell warned him that there would be a camera. She also told him she did not want the bag in her house. He left for about 15 to 30 minutes, returning without the bag.[31] When refreshed with a transcript of her statement to the Newark police during a suppression hearing in this case, she recalled when Cooke returned, he said he had tried to use the credit cards, they did not work, and then he threw them away.[32] Later when shown a picture taken at the ATM/MAC where Caudra's cards were used or attempted to be used, she identified the person in it as Cooke.[33]

Based on Caudra's description, help from the artist and the MAC machine picture, a composite drawing of the suspect in those matters was drawn up. The drawing was put on a wanted poster. The posters were placed in many locations all

24. Proof positive hearing transcript, pp. 17–18.

25. Suppression hearing transcript, February 1, 2006, pp. 14–16.

26. *Id.* at p. 17.

27. *Id.* at p. 18.

28. *Id.* at p. 19.

29. *Id.* at pp. 21–22.

30. *Id.* at pp. 23–24.

31. *Id.* at pp. 25–26.

32. *Id.* at pp. 29–30.

33. *Id.* at pp. 31–32.

over the City of Newark.[34] One location was the Payless Shoe Store in the College Square shopping center. On May 31st employees of the store called the Newark Police to indicate that the person depicted was Cooke. An earlier version of the poster had been put up around May 4th and Cooke came into work the next day. That was the last day he worked, and the poster also disappeared.[35] The tip from the co-workers came on the 31st after a later version of the wanted poster was put with a clearer picture on it.[36]

The charges involving Cheryl Harmon are alleged to have occurred on April 27, 2006. One of the charges is burglary second degree, and the residence is 11–2 Thorn Lane, Towne Court Apartments in Newark. This is the same apartment complex as the apartment in which Bonistall's apartment was located. The back of 9 Lincoln Drive faces Towne Court Apartments.[37]

This burglary was between 6:50 a.m. on April 26 and 1:04 a.m. on the 27th.[38] There was unusual writing on the walls. In the living room it said, "We'll be back." On the bedroom door it stated, "Don't mess with my men," and on the bathroom door, "I want my drug money."[39] While Harmon was not home during the burglary, items of hers were stolen. Once such item was a gold ring with "Cheryl" written in cursive on it and a high school ring with her full name inscribed on it.[40]

On May 2, 2005, a person called Newark Police 911. Campbell, Cooke's female friend, has identified the caller's voice as that of Cooke. A transcript of that call [41] has these pertinent statements:

> Male: This is about the stuff that's about to go down in Newark.
>
> Between from here to March the 18th, the white power will kill everybody down there.
>
> That people that owe us money we comin' to come get it. This is some . . .
>
> You think them fires were somethin', you think that body was somethin' that we left in that, in that Collins (sp) Park apartment. Or wait 'til we do this. We want our money back or else we gonna kill more.
>
> Now going from this day from May, 'til the 18th, there's eight more bodies gonna pile up there.
>
> And I could tell you who killed that girl.
>
> Operator: Okay. Alright. Well, if you give me the information I can put it in the computer and give it to an officer.
>
> Male: On Sunday, well it started on Friday, a house was broken in. Right?
>
> It was a house broken in.
>
> Now we went there for another lady named Miss Carolina (sp) that oweded (sic) us money for drugs.
>
> We went in . . . .

---

34. Proof positive hearing transcript, October 28, 2005, p. 46.

35. *Id.* at pp. 47–48.

36. *Id.*

37. Proof positive hearing transcript, October 28, 2005, p. 18.

38. Suppression hearing transcript, February 2, 2006, p. 4.

39. *Id.* at 5.

40. *Id.*

41. State's Exhibit 1 to its response to Cooke's motion to suppress evidence, a CD of which the Court has heard.

We, we went in another house but the lady wasn't there. But we didn't come there for the lady, we came there for her man. Her name was Cheryl (sp). Then we went to a, a little place called a, a Collins apartment.

We went there. And we went, to go get out money, collect our money. We have nine pictures in our hands, right now, we looking at.

And .... we're coming to get our money. I'm not part of this no more. I'm done with it. We're called the white superior. But we called white power when we kill. We believe that God sent us here first.

And the other one is Matt Minor. What they call Matthew. He's short. He goes from Matt. They got fake ID's, they wear gloves all the time and they wear black hoodies. And how did they get in that lady's, lady's apartment? I could tell you. The played, they paid that black nigger that works there. They gave him ... they gave him five hundred dollars. The black nigger to get the key. The master key. He gave'em the master key and brought the master key back. We duplicated it. There was a look out. There was supposed to not to be nobody get hurt. Just to go collect our money. There's a lot of things going on that people don't know about.

And I guess they tied the girl up and killed her. And we be ... they be writin' on the walls. Talk about "KKK," "White power." I'm tellin'. (beep) I'm tellin' ya stuff that's all true.

I can't get away from 'em right now. (car horn sound). And they plan on staying' down . here until the eighteenth of this month. They have nine pictures. They gotta get these other people that owe 'em money. It's all about drugs. Now they looking for this, this some girl name Carolina [42] whatever her name is. I don't know what's going on. But I know I'm trying to get out. I want protection. I want protection. .

As Detective Andrew Rubin, the chief investigating officer on the Bonistall murder, testified, it is this call which alerted the police for the first time of the relationship of the Bonistall murder, and the Caudra and Harmon burglaries. [43]

The sum of all of this is to demonstrate that the record at this point shows a close interrelationship of the three sets of charges and the evidence in them. They are inextricably intertwined. It is the caller, who was Cooke, according to Campbell, who linked them. He not only mentioned all three incidents but provided sufficient details, names, Cheryl and Carolina for instance, to betray facts not publicly known. The reference to Carolina Bianco was to a name not publicly linked to the Caudra incident.

Key, too, in this phone call is the phraseology about drugs and money and white power which relate (certainly as to drugs and money) to the writing in the Bonistall and Harmon apartments. There is a reference in the call to white power and KKK which ties into the unusual writing on the walls in Bonistall's apartment.

The incidents are within a five day period. Two are in the same apartment complex which abuts Cooke's residence at the time, 9 Lincoln Drive. And all three are

---

42. Caudra's roommate is Carolina Bianco.

43. Proof positive hearing transcript, October 28, 2005, at 42–43.

within less than a mile of that residence. In addition, his residence is not far from the ATM/MAC machine which the record, to date, would indicate Cooke used within a few hours of the Caudra incident.

The Caudra incident was 24 hours or less prior to the Bonistall murder. The Caudra incident led to the issuance of a wanted posted with a composite of the suspect in that incident and the attempted use of her credit cards. One day after the initial poster is put up at Cooke's place of work, he stops working there and the poster disappears.

The Court must be clear about what all of the above means and does not mean. First, the Court has recited what the record shows from three separate hearings. Second, it is that record upon which the Court is relying to make its comments, findings and conclusions in connection with Cooke's severance motion. Third, it is NOT a trial record. It does not represent a record upon which any jury has rendered any verdict. Fourth, the Court's recitation of the record so far is not a finding of whether Cooke is guilty or not guilty. Detailed recitation of the three incidents is necessary to enable the Court to exercise its discretion whether to grant or deny Cooke's severance motion. The record from all these hearings supports Cooke's argument that with the DNA evidence, the State's case on the Bonistall related offenses is strong. But the record also, at this point and in connection with the Court's exercise of its discretion whether to sever, shows the State's case on the other two sets of charges is reasonably

strong. And there is evidence in each of the three sets intertwined with the other two sets of charges.

 Where the charged offenses are of the same general character, involving a similar course of conduct and allegedly occurring within a relatively brief time span, it can be proper to have one trial.[44] The fundamental question before the Court, however, is whether the offenses charged here are properly tied together.[45] Severance is not required where the charged offenses involve different victims and occur at separate locations on separate dates.[46] The Court is satisfied that the State is not seeking the introduction of evidence of one crime to show Cooke's general disposition to commit another charged offense. Also, the Court finds the offenses were a part of a common plan or scheme and all evidence was the same or similar *modus operandi*. Even though the crimes were separate and committed against different persons, they do not require severance.[47] The Court is satisfied that the jury will be able to distinguish the charged offenses and segregate the evidence.[48]

### *Cumulative Evidence*

Next the Court must determine whether Cooke would suffer prejudice in the joinder of the offenses charged. The first prong set forth in *Wiest* states "the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find...."[49] "The numerical total of the

44. *Younger v. State,* 496 A.2d 546, 550 (Del. 1985).

45. *Brown v. State,* 310 A.2d 870, 871 (Del. 1973).

46. *Fortt v. State,* 767 A.2d 799, 803 (Del. 2001).

47. *Skinner,* 575 A.2d at 1118.

48. *Id.* at 1119.

49. *Wiest,* 542 A.2d at 1195.

counts in an indictment is not in and of itself determinative of 'sheer mass' " [50]

In *State v. McKay*,[51] the defendant was to be tried on a 35 count indictment (4 burglaries, 11 PDWDCF counts, 8 robbery firsts, 4 rape firsts, 1 kidnapping, 1 attempted robbery, 1 escape after conviction, and 1 PFBPP). Obviously the latter two of those charges injected his criminal record. Recognizing that similarities "abound(ed)," [52] the Court nevertheless believed there was a "sheer mass" of evidence that a jury could not render individualized verdicts and would assume a general criminal disposition.[53] It should be noted that the State in *McKay* had a lengthy confession, fingerprints, and eyewitness identification—apparently in almost all, if not all, of the rapes—which meant there was no need to show *modus operandi*.[54]

This Court does not see a sheer mass of evidence and certainly not a sheer mass that would overwhelm a jury. There are three incidents here versus at least eight (most of which had related charges) in *McKay*.[55]

One significant difference between this case and *McKay* is the lack of interlocking evidence, particularly exemplified by the phone call, but by other evidence, as previously discussed. The handwriting on the walls of two of the three crime scenes, and Campbell's testimony about Cooke and the "book" bag, credit cards, etc., within just a very few hours after the Caudra incident are examples.

There is a need for the State to show the jury evidence of a common *modus operandi*. While that is important, the necessarily interlocked evidence is also important in terms of proving guilt as to each of the three incidents.

In this regard, *State v. Flagg*[56] is instructive. Also, Cooke relies heavily upon it. Flagg was indicted for the murder of Anthony Puglisi and the kidnapping and rape of his wife, Debra Puglisi. The State wanted to try at the same trial six separate charges, originally in a separate indictment, of burglary, weapons and sex offenses alleged to have occurred three days before the murder involving a different person. As to the issue of cumulative evidence of all these offenses and its impact on the jury, this Court said:

> Here the State offers a plethora of circumstantial evidence linking Defendant Flagg to both incidents. Where multiple incidents circumstantially point to the perpetrator's identity, severance has been denied because the evidence is of the same type and impact. The Court finds that trying the Puglisi and [other] charges together does not subject Defendant to prejudice from overwhelming the jury with the weight of the evidence (footnote omitted).[57]

This statement applies to the evidence in this case.

### General Criminal Disposition

■ The second *Wiest* factor in weighing potential prejudicial joinder is that "the jury may use the evidence of one of the crimes to infer a general criminal dis-

**50.** *State v. Siple,* 1996 WL 528396 (Del.Super.), at *3.

**51.** 382 A.2d 260 (Del.Super.1978).

**52.** *Id.* at 262.

**53.** *Id.*

**54.** *Id.* at 263.

**55.** *Id.*

**56.** 739 A.2d 797 (Del.Super.1999).

**57.** *Id.* at 800.

position of the defendant in order to find guilt of the other crime or crimes...."[58] As evidence of one crime is not admissible to prove disposition to commit another crime, courts will generally presume prejudice and exclude such evidence unless such evidence is admissible for some substantial, legitimate purpose.[59]

■ Evidence of other crimes is admissible when, not exclusively, such evidence relates to:

(1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial.[60]

The State will not be presenting evidence of the other charged offenses to prove Cooke's character. In Delaware, guidelines for admission of other crimes evidence under Rule 404(b)[61] were set forth in *Getz*.[62]

While noting on the interlocked or inextricably intertwined evidence, there is nec-essarily the concern that the evidence of these offenses, if not severed, could be used to show a general criminal disposition. The State must prove Cooke's guilt beyond a reasonable doubt as to each charge and as each charge applies to a given incident. But that is where its interlocking evidence is necessary and where its case as to *each* incident would prejudicially suffer from severance. The three incidents are so related that proof needed for one is needed for the others. At the same time, the Court observes that the potential unfair prejudice to Cooke is insufficient to require severance.

### Embarrassment or Confusion From Separate Offenses

■ Cooke has informed the Court that he intends to plea guilty, but mentally ill to the offenses revolving around the Bonistall murder. Under Delaware law, such a plea is defined as:

Where the trier of fact determines that, at the time of the conduct charged, a defendant suffered from a psychiatric disorder which substantially disturbed such person's thinking, feeling or behav-

---

**58.** *Wiest* at 1195.

**59.** *Boyer v. United States*, 132 F.2d 12, 13 (C.A.D.C.1942).

**60.** *Drew*, 331 F.2d at 90 (C.A.D.C.1964).

**61.** (b) Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. D.R.E 404(b).

**62.** (1) The evidence of other crimes must be material to an issue or ultimate fact in *dispute* in the case. If the State elects to present such evidence in its case-in-chief it must demonstrate the existence, or reasonable anticipation, of such a material issue.

(2) The evidence of other crimes must be introduced for a purpose sanctioned by Rule 404(b) or any other purpose not inconsistent with the basic prohibition against evidence of bad character or criminal disposition.

(3) The other crimes must be proved by evidence which is "plain, clear and conclusive." *Renzi v. State*, Del.Supr., 320 A.2d 711, 712 (1974).

(4) The other crimes must not be too remote in time from the charged offense.

(5) The Court must balance the probative value of such evidence against its unfairly prejudicial effect, as required by D.R.E. 403.

(6) Because such evidence is admitted for a limited purpose, the jury should be instructed concerning the purpose for its admission as required by D.R.E. 105. *Getz v. State*, 538 A.2d 726, 734 (Del.1988).

ior *and/or* that such psychiatric disorder left such person with insufficient willpower to choose whether the person would do the act or refrain from doing it, although physically capable, the trier of fact shall return a verdict of "guilty, but mentally ill." [63]

He has likewise stated that he intends to plead not guilty to the charges relating to Caudra and Harmon. His motion offers this explanation:

> The State's evidence in the Bonistall murder case is overwhelming. The State's evidence in 11-2 Thorn Lane burglary and the 209 West Park Place home invasion is much weaker. Arguably, the DNA evidence proves the murder case against Mr. Cooke. In the burglary case, on the other hand, there is no physical evidence or eyewitness identification which would lead a jury to conclude beyond a reasonable doubt that the defendant had committed the burglary. Likewise, in the home invasion case there is no physical evidence linking the defendant to the crime. In addition, the identification evidence in the home invasion case is inconsistent. [64]

The reference to the inconsistency in the Caudra matter is that, he says, she identified Cooke from the ATM/MAC photo but did not pick him out in a photo line up.

There are a number of observations. The first is the nature of the plea, the definition of which was quoted above. It is known as a "confession and avoidance" plea, an admission of guilt but with extenuating circumstances. The next observation is that despite that plea and its necessary admission of guilt, Cooke has filed motions *in limine* to have this Court exclude handwriting comparison evidence, hair analysis evidence, fingerprint evidence, some of the DNA evidence and some video evidence. In the alternative he seeks to exclude the State's experts who would testify about these subjects. [65]

■ Commendably, therefore, Cooke is apparently pursuing two lines of defense. One may be more obvious, guilty, but mentally ill, but the other is a fundamental challenge on the issue of guilt. As to these two defenses relating to the Bonistall murder, Cooke is entitled to pursue inconsistent defenses. [66] Juries in first degree murder cases have been correctly charged on the role of intoxication-confession and avoidance—where the defense was alibi which is anything but confession and avoidance. [67]

The difference, of course, in these cases is that the inconsistent defenses were raised or occurred relating to the same set of charges. Here Cooke's defenses differ according to which set of charges are in-

**63.** *Aizupitis v. State*, 699 A.2d 1092, 1095 (Del.1997).

**64.** Cooke motion at paragraph 11.

**65.** Hearings on these motions are scheduled for November.

**66.** *Zimmerman v. State*, 628 A.2d 62, 67 (Del. 1993); see *Henry v. State*, 805 A.2d 860 (Del. 2002), where the defense to first degree murder charge was extreme emotional distress. That defense is also "confession and avoidance" and if proven reduces the offense to

manslaughter. Mysteriously in reversing this Court's decision to not charge on murder second degree because there was evidence to support it, the Supreme Court did not mention the defense and its inconsistency with second degree murder, in that extreme emotional distress requires an intentional killing but second degree murder is not an intentional killing. Extreme emotional distress does not apply to second degree murder. Of course, there is no harm in that inconsistency.

**67.** *Herhal v. State*, 243 A.2d 703, 706 (Del. 1968).

volved, Bonistall's on the one hand and Caudra/Harmon on the other.

He relies heavily on another part of this Court's decision in *State v. Flagg*[68] as support for his argument about the potential for impermissible confusion or embarrassment. The Court has discussed *Flagg* in the context of the impact of evidence from two crimes.[69] But the key holding in *Flagg* is that the Court ordered severance of the murder and rape charges involving Mr. and Mrs. Puglisi from the burglary and rape charges of several days before involving a Karin King.

In *Flagg* the defendant was pleading the defense of not guilty by reason of insanity as to the Puglisi related charges. He was going to plead not guilty to the King related charges. This Court found Flagg would suffer confusion, embarrassment and "substantial injustice."[70] The Court permitted the State, however, to introduce evidence of the King offenses in its rebuttal case.[71]

At first glance, there are some parallels between *Flagg* and this case. There was a murder charge to which Flagg was entering the plea of not guilty by reason of insanity. Here, the plea to the Bonistall related charges will be guilty, but mentally ill. As to the charges in *Flagg* and here which did not involve the murder related charges, the defendants' pleas were/are not guilty. In this and the *Flagg* case there is an alleged temporal proximity of the murder related and non-murder related charges.

But the Court's analysis must go beyond these noted parallels. The State notes there was a confession in *Flagg*, but the Court's opinion makes no reference to it. There is no inculpatory statement by Cooke to the police which has been brought to the Court's attention. It is difficult, therefore, to assign any significance to those representations.

The State makes additional representations, however, about Cooke's discussions with the two experts who have prepared reports and who will apparently testify in connection with the plea of guilty, but mentally ill. It observes that with one he did not discuss the Bonistall matter and with the other he was ambivalent. The Court has not been privy to the full contents of these reports. The Court merely notes them but draws no conclusion from them. The State argues that these reports demonstrate that it must be prepared to prove in its case-in-chief that Cooke is guilty of all the charges relating to the Bonistall matter (as well, of course, the remaining charges in the indictment). To meet that burden, it asserts, it needs the evidence from the other two incidents. Again, without more, the Court cannot assign any value to this argument without those reports in the record.

The key difference between *Flagg* and this case is the qualitative distinction between the pleas of not guilty by reason of insanity and that of guilty, but mentally ill. The plea of not guilty by reason of insanity is an affirmative defense.[72] An affirmative defense must be proved by a preponderance of the evidence.[73]

But the plea of guilty, but mentally ill is a defense which carries no burden of proof, only that there be some credible evi-

---

68. 739 A.2d 797 (Del.Super.1999).

69. *Supra* pp. 18–19.

70. *Id.* at 800.

71. *Id.* at 803.

72. 11 *Del. C.* § 401(a).

73. 11 *Del. C.* § 304.

dence.[74] *Sanders v. State* explains the distinction:

> Second, Sanders argues that the trial judge erred by referring to a verdict of "guilty but mentally ill" as an affirmative defense in his jury instructions. In two instances, the judge used the word "defenses" when referring collectively to the defense of insanity and the verdict of "guilty but mentally ill." Although a plea, and subsequent verdict, of "guilty but mentally ill" does not constitute a "defense" to criminal liability, since it subjects the defendant to punishment for his acts, the judge's oblique use of the term "defenses" was clearly harmless error. The record reveals that the judge took great pains to distinguish between the defense of insanity and the verdict of "guilty but mentally ill." Thus, his slight misstatement would not have led a reasonable juror to believe that a verdict of "guilty but mentally ill" would excuse Sanders form criminal liability.[75]

And there is a substantive reason for that. With a verdict of not guilty by reason of insanity, a defendant (1) is not sentenced, (2) is not put in jail, and (3) is placed into the custody of the Department of Social Services at the Delaware Psychiatric Center.[76] Such a person is kept there until it is determined he or she is no longer a threat to public safety.[77]

A defendant who receives a verdict of guilty, but mentally ill is to be sentenced, as if found guilty and "may have any sentence imposed which may be lawfully imposed upon any defendant for the same offense."[78] In a case such as this, that could mean life or death.[79] A defendant who has received such a verdict may receive treatment, but he or she (1) remains under the authority of the correctional authorities and (2) when the treatment is concluded, that defendant is returned to jail to serve his or her sentence and is not released.[80] But, as the Court said in *Sanders*, with a guilty, but mentally ill verdict, the sentencing authorities (jury and judge) would be required to base its recommendation and sentence on the "implicit findings of both criminal responsibility and mental illness."[81]

The other substantive distinction from *Flagg* rests on the earlier noted one that guitly, but mentally ill is not a defense in the same way as not guilty by reason of insanity. In *Sanders*, this other distinction is stated this way:

> The court correctly instructed the jury that the State must prove guilt beyond a reasonable doubt before a verdict of "guilty" of "guilty but mentally ill" could be rendered. It also instructed the jury that the defendant must prove insanity by a preponderance of the evidence before a verdict of "not guilty by reason of insanity" could be reached.[82]

Since the State must first prove guilt beyond a reasonable doubt for a jury to even consider a verdict of guilty, but mentally ill, the qualitative difference between

---

**74.** 11 *Del. C.* § 303; *Daniels v. State*, 538 A.2d 1104, 1112 (Del 1988).

**75.** *Sanders v. State*, 585 A.2d 117, 130–31 (Del.1990).

**76.** 11 *Del. C.* § 403.

**77.** *Id*, see *Daniels v. State*, 538 A.2d 1104 (Del.1988).

**78.** 11 *Del. C.* § 408(b).

**79.** *Sanders*, 585 at 128.

**80.** 11 *Del. C.* § 408.

**81.** *Sanders*, 585 A.2d at 133, citing *Daniels v. State*, 538 A.2d 1104, 1108 (Del.1988).

**82.** *Id.* 585 A.2d at 131.

a plea of not guilty by reason of insanity and guilty, but mentally ill is all too obvious. The detailed discussion earlier [83] of the evidence demonstrates, in this Court's view, that the State, to meet its burden on the Bonistall related charges, should have the ability to introduce the evidence that touches on the other two incidents that goes to its burden on the Bonistall incident.

Other than the general *modus operandi* as in *Flagg*, the evidence here goes beyond that to identity and other appropriate evidentiary considerations to enable the State to meet its burden on the Bonistall charges. There was no evidentiary interrelationship in *Flagg* as here, and, unlike *Flagg*, Cooke was identified as a suspect in the murder not in a few days but over a month later. Examples include the wall writings, the content of the 911 call, the record presented about the wanted poster matters, and so forth. And those matters not only related to the State's burden in the Bonistall matter but the other two incidents, too.

The Court notes that Cooke's motion to sever, particularly the portion quoted earlier [84] hints that the reason for the plea on the Bonistall related charges is premised more on the strength of the State's case, even though it is still a "whodunit," but that the not guilty pleas to the other two sets of charges are premised on evidence which he asserts is not as strong. A defendant is permitted to raise any appropriate plea and it is Cooke's right to interpose the two pleas he has proffered here.

Since the evidence of the Caudra and Harmon matters is admissible in the State's case-in-chief as to the Bonistall related charges, it is unnecessary to discuss its use in rebuttal if not allowed in its case-in-chief. [85]

Of course, if the jury returns a verdict of guilty but mentally ill, Cooke is entitled to an instruction stating that it has established a mitigating factor as a matter of law and be told of the treatment component of what that verdict means. [86]

### Conclusion

For the reasons stated herein, Defendant James Cooke's motion for relief from prejudicial joinder is **DENIED**.

**IT IS SO ORDERED.**

---

**83.** *Supra* pp. 7–16.

**84.** *Supra* p. 21.

**85.** Compare *Flagg*, 739 A.2d at 800–803. Curiously, the Court's conclusion here renders moot the interesting but complex question of the State's potential to cross-examine Cooke's experts about the other crimes during his case.

**86.** *Sanders*, 585 A.2d at 134.